**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. LR-5733
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Telephone: (973) 313-1887
Fax: (973) 833-0399
lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| WILLIAM MARTIN, TIM MOORE, ROLAND LENTZ, MIKE WANG and JEFF WILSHIRE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> vs. <br><br> DAN NICHTER,  EDI FINANCIAL, INC., FINANCIAL WEST GROUP, MIDAMERICA FINANCIAL SERVICES, INC., SHAUN DARNELL YOUNG, S&M, LTD., MARTIN WILLIAM PRINZ, and GENE CHARLES VALENTINE, <br><br> Defendants. | CIVIL ACTION NO.: 3:17-cv-01436-M-BH <br><br><br> **PLAINTIFFS' THIRD AMENDED COMPLAINT** <br><br><br> **CLASS ACTION** |

## PLAINTIFFS' THIRD AMENDED COMPLAINT

Plaintiffs Tapan & Anisa Daftari, William Martin, Tim Moore, Mike Wang, and Jeff

Wilshire (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly

situated, file this Third Amended Complaint against Defendants Dan Nichter,  EDI Financial, Inc.,

Financial West Group, MidAmerica Financial Services, Inc., Shaun Darnell Young, S&M, LTD.,

Martin William Prinz, and Gene Charles Valentine (collectively, "Defendants"), and for causes of action respectfully alleges to the Court and the jury as follows:

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons and entities, other than Defendants, who purchased or otherwise acquired limited and/or general partnership interests ("units") in two Texas Limited Partnerships, Payson Petroleum 3 Well, LP ("3 Well") and Payson Petroleum 3 Well 2014, LP ("3 Well 2014," together with 3 Well, the "3 Well Program"), by means of two sets of fraudulent offering documents:

> a.  3 Well's private placement memorandum (the "3 Well PPM") and other offering documents for an offering that commenced on October 23, 2013 and closed on December 31, 2013; and/or

> b.  3 Well 2014's private placement memorandum (the "3 Well 2014 PPM") and other offering documents for an offering that commenced on January 12, 2014 and closed on June 30, 2014.

2.      Between October 2013 and June 2014, the Sellers (defined below) conducted a fraudulent two-phase integrated offering of units to develop three oil and gas wells in Grayson County, Texas. The Sellers offered 1,000 units in the 3 Well Program, at $27,000 per unit, for a total offering size of $27 million. Ultimately, the two integrated offerings raised $23 million from more than 150 investors located nationwide.

3.      Payson Petroleum, Inc. ("Payson"), the operator and sponsor of the 3 Well Program, was responsible for drilling, operating, and completing the wells.

4.      The Sellers represented to Plaintiffs and Class members that: (1) Payson agreed to purchase 200 units in the 3 Well Program for $5.4 million; (2) in no event will Payson not purchase

at least 100 units in the 3 Well Program; (3) Payson's $5.4 million capital infusion would fund 20% of the cost of the 3 Well Program; (4) Payson's consideration as sponsor/operator/co-investor of the partnerships would be limited solely to 20% of any petroleum revenue generated by the wells; and (5) the "estimated" cost to drill and complete the wells was approximately $24 million.

5.      Payson's promise to contribute 20% of the capital for the 3 Well Program was designed to distinguish Payson from other oil and gas operators which typically receive a carried interest in production revenue, ***without putting up additional consideration***. In contrast, the Sellers' represented to Plaintiffs and Class members that in the 3 Well Program, Payson was putting its own money at risk of loss, $5.4 million or 20% of the offering amount, thereby aligning itself with Plaintiffs and Class members in looking to production revenue from the wells for a return of its $5.4 million principal investment, and beyond that, a profit. Moreover, unlike typical oil and gas sponsors, Payson did not receive a carried interest in the wells production revenues.

6.      The Sellers' representation of Payson's significant investment in the 3 Well Program made the program immediately more enticing to Plaintiffs and Class members. Payson, as sponsor/operator of the 3 Well Program, would be capable of overseeing and managing its own investment, and in securing it against failure. Thus, Plaintiffs and Class members were led to believe that their sponsor and operator was a serious partner with significant "skin in the game," who would secure its own investment and ensure its success.

7.      Plaintiffs and Class members were misled by these representations because in fact: (1) Payson never purchased a single unit and thereby contributed no money to the 3 Well Program; (2) consequently, Payson paid nothing towards its 20% share of the cost of the 3 Well Program; (3) Payson lacked the financial means to make the $5.4 million payment; (4) the true costs of drilling and completing the wells was $16-$18 million; (5) the "estimated" $24 million cost to drill

Case 3:17-cv-01436-S-BH   Document 93   Filed 08/13/18   Page 4 of 35   PageID 1497

and complete the wells was Payson's undisclosed fixed fee for drilling the wells, regardless of the actual drilling cost; and (6) Payson pocketed the difference between the $23 million raised in the two integrated offerings and the actual drilling cost—$16-$18 million..

8.      Payson plainly lacked the financial means to make good on its promise to invest $5.4 million in the offering. Indeed, as of September 30, 2013, three weeks before the first phase of the offering commenced (October 23, 2013), Payson had only $58,722 in its bank account. Payson's audited financials for the years ended 2011, 2012, and 2013, showed year-end losses of $352,742, $496,655, and $1,566,984, respectively. In fact, Payson's auditor noted that Payson's losses and deficits put Payson's ability to continue as a going concern in doubt. Although Payson's 2013 audited financials were not finalized until June 26, 2014—four days before the closing of the second offering—an unaudited Payson balance sheet and statement of income for the period ended September 30, 2013 revealed that Payson had a net loss of $616,272, a cash position of only $58,722, and an accumulated deficit of $1,139,106. As such, at the time of the commencement of both the first and second offering (January 12, 2014), it was clear that Payson lacked the financial means to make good on its promise to invest $5.4 million in the offering. The Sellers never disclosed these material facts to Plaintiffs.

9.      In fact, on June 10, 2016, Payson and its sub-contractor, Payson Operating, LLC ("Payson Operating"), both filed for protection under Chapter 7 of the U.S. Bankruptcy Code. The filing was later converted to a Chapter 11 filing, to allow the bankruptcy trustee to conduct plugging and abandonment procedures on Payson's wells, as required by the State of Texas. The bankruptcy trustee projected that, after administrative expenses, neither company will have funds available to pay its unsecured creditors.

PLAINTIFFS' THIRD AMENDED COMPLAINT                                                    PAGE 4

10.     Further, the Sellers never disclosed to Plaintiffs and Class members that the true costs of drilling and completing the wells was $16-$18 million, approximately $6-$8 million less than the "estimated" cost ($24 million) represented by the Sellers. Moreover, the Sellers never disclosed that Payson had a "turn-key" agreement[1] with the limited partnerships whereby Payson would retain as its putative "drilling fee," $24 million *net of actual well costs*. By not informing Plaintiffs and Class members about this "turn-key" arrangement, and without disclosing Payson's consideration for drilling and completing the wells, the Sellers failed to disclose that Payson would pocket the difference between its undisclosed $24 million "turn-key" fee and the wells actual cost—$16-$18 million. In addition to being a material omission, this contradicts the Sellers' representation that Payson's consideration would be limited to 20% of any petroleum revenue generated by the wells.

11.     Neither 3 Well or 3 Well 2014, nor Plaintiffs or Class members, received back any portion of the difference between the $23 million that was raised in the offerings and the wells actual cost. Instead, the difference was appropriated by Payson pursuant to the undisclosed "turn-key" arrangement, to the detriment of Plaintiffs and Class members.

12.     As a result of this fraudulent offering, on November 23, 2016, the U.S. Securities and Exchange Commision ("SEC") filed an action against Payson's principals, Matthew Carl Griffin and William Daniel Griffin, whereby both entered into consent judgments agreeing to accept a civil penalty and "not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the [SEC's] Complaint or creating the impression

---

[1] A "turn-key" agreement is an agreement under which a contractor completes a project, then hands it over in fully operational form to the client, who needs to do nothing but "turn a key" to set it in motion.

that the [SEC's] Complaint is without factual basis." This action is centered upon the same underlying factual allegations as the SEC action.

13.     The Sellers' disseminated to Plaintiffs and Class members offering documents, including the 3 Well PPM and the 3 Well 2014 PPM, containing the aforementioned untrue statements of material facts and/or omissions of material facts, and reiterated to Plaintiffs and Class members the same, in meetings and communications, at investor events, dinners, and sales presentations, and by other marketing and promoting mechanisms, in order to solicit their purchases of units in the 3 Well Program.

14.     Defendants EDI Financial, Inc., Financial West Group, and MidAmerica Financial Services, Inc. collectively earned millions of dollars in sales commissions from selling units to Plaintiffs and Class members by means of untrue statements of material facts and/or omissions of material facts.

15.     Defendant Dan Nichter received bonuses for selling approximately $3.92 million of units to Plaintiffs and Class members, without the use of any broker-dealers, by means of untrue statements of material facts and/or omissions of material facts.

## PARTIES

### A.  Defendants

16.     Defendant Dan Nichter ("Nichter") resides at 601 E. College St., Denton, Texas 76209. Nichter was the Director of Client Relations at Payson and head of Payson's marketing department throughout the period of the two integrated offerings, between October 2013 and June 2014. Throughout the period of the two integrated offerings, Nichter received bonuses from Payson for selling and soliciting purchases of units to Class members. As an agent of Payson, a seller of units, Nichter sold units to Plaintiffs and Class members and actively solicited their

purchases of units. Nichter was a driving force behind the offering by virtue of his positions as head of Payson's marketing department and Director of Client Relations at Payson. Through these positions, Nichter directed all of Payson's marketing efforts and all its solicitations of Plaintiffs' and Class members' purchases of units. Accordingly, Nichter was a seller of every unit sold by Payson. Defendant Nichter sold 148.33 units in the 3 Well Program for approximately $3.92 million.

17.    Defendant EDI Financial, Inc.'s ("EDI Financial") principal executive offices are located at 1431 Greenway Drive, Suite 330, Irving, Texas 75038. EDI Financial sold 231.31 units in the 3 Well Program for approximately $6.15 million.

18.    Defendant Martin William Prinz ("Prinz") has been the President, Director, CSO, and CCO of EDI Financial since July 1988. Prinz owns 75% or more of EDI Financial and directs the management and policies of EDI Financial.

19.    Defendant Financial West Group's ("Financial West") principal executive offices are located at 961 Matley Lane, Suite 110, Reno, NV 89502. Financial West sold 337.60 units in the 3 Well Program for approximately $9.25 million.

20.    Defendant Gene Charles Valentine ("Valentine") has been the Chairman and Chief Executive Officer ("CEO") of Financial West since May 1985 and directs the management and policies of Financial West.

21.    Defendant MidAmerica Financial Services, Inc.'s ("MidAmerica") principal executive offices are located at 902 NW Murphy Blvd., Joplin, MO 64801. On November 1, 2015, MidAmerica ceased doing business. MidAmerica sold 49.73 units in the 3 Well Program for approximately $1.3 million.

22.     Defendant S & M, LTD. ("S & M") has been the parent company of MidAmerica since July 2001 and owns 75% or more of MidAmerica. S & M directs the management and policies of MidAmerica. S & M's principal executive offices are located at 411 South Sangamon Street, Suite 5B, Chicago, Illinois 60607.

23.     Defendant Shaun Darnell Young ("Young") was President of MidAmerica throughout the period of the two integrated offerings, between October 2013 and June 2014. Throughout that time, Young directed the management and policies of MidAmerica. Young resides at 802 Canyon Dr., Neosho, Missouri 64850.

24.     Nichter, EDI Financial, Financial West, and MidAmerica are collectively referred to herein as the "Sellers."

25.     EDI Financial, Financial West, and MidAmerica are collectively referred to herein as the "Broker-Dealer Defendants."

26.     Prinz, Valentine, S & M, and Young are collectively referred to herein as the "Control Person Defendants."

27.     During the period of the two integrated offerings, the Broker-Dealer Defendants were registered as broker-dealers with the SEC and the Financial Industry Regulatory Authority ("FINRA"), and were registered as securities dealers with the Texas State Securities Board.

28.     The Broker-Dealer Defendants offered units on a best-efforts basis to Plaintiffs and Class members by actively soliciting their purchases of units. The Broker-Dealer Defendants sold units to Plaintiffs and Class members to further their own financial motives, by receiving sales commissions or other compensation for completing sales of the units.

29.     Nichter sold units to Plaintiffs and Class members without the use of any broker-dealers.

**B.  Plaintiffs**

30.      Plaintiff William Martin purchased 1.56 units in 3 Well from EDI Financial for $40,000. He subsequently purchased 2.18 units in 3 Well 2014 from EDI Financial for $59,000.

31.      Plaintiff Tim Moore ("Moore") purchased 1 unit in 3 Well from Nichter for $27,000. Moore also purchased 4.25 units in 3 Well 2014 from Nichter for $114,750.

32.      Plaintiffs Tapan & Anisa Daftari (the "Daftaris") purchased 4 units in 3 Well 2014 from MidAmerica for $108,000.

33.      Plaintiff Mike Wang ("Wang") purchased 1.11 units in 3 Well 2014 from Financial West for $30,000.

34.      Plaintiff Jeff Wilshire ("Wilshire") purchased 1.17 shares in 3 Well from EDI Financial, Inc. for $30,000.

**C. Relevant Non-Parties**

35.      Non-party Payson Petroleum Grayson, LLC ("Payson Grayson"), a Texas Limited Liability Company, was the Managing General Partner of 3 Well and 3 Well 2014 throughout the offering of the 3 Well Program. Payson Grayson engaged the services of the Broker-Dealer Defendants to assist in the sales of the units. Payson Grayson is an affiliate of Payson, Matthew Carl Griffin, and William Daniel Griffin.

36.      Non-party Matthew Carl Griffin ("M. Griffin"), age 41, is the founder of Payson and was at all relevant times Payson's sole owner, President, Chief Executive Officer ("CEO"), and Chairman. M. Griffin was also the President of Payson Grayson.

37.      Non-party William Daniel Griffin ("W. Griffin"), age 52, was at all relevant times Payson's Chief Administrative Officer and a member of Payson's board of directors. On August

1, 2016, W. Griffin filed a petition for Chapter 7 personal bankruptcy in the U.S. District Court for the Eastern District of Texas.

## JURISDICTION AND VENUE

38.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

39.    This Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged by Plaintiffs occurred in Texas, Defendants have sufficient minimum contacts with and/or otherwise intentionally avail themselves of the markets in Texas, and Defendants have sufficient contacts with this District such that it is fair and just for Defendants to adjudicate this dispute here.

40.    Venue is proper in this District because EDI Financial is headquartered within this District, Defendants are subject to personal jurisdiction here, a substantial portion of the Defendants' alleged wrongdoing occurred here, and many of the witnesses to the Defendants' alleged wrongdoing are believed to be located here.

## UNTRUE STATEMENTS OF MATERIAL FACTS AND/OR OMISSIONS OF MATERIAL FACTS

41.    The Sellers disseminated to Plaintiffs and Class members offering documents, including the 3 Well PPM and the 3 Well 2014 PPM, containing the following untrue statements of material facts and/or omissions of material facts, and reiterated to Plaintiffs and Class members the same, in meetings and communications, at investor events, dinners, and sales presentations, and by other marketing and promoting mechanisms, in order to solicit their purchases of units in the 3 Well Program.

### A.  3 Well PPM

42.    The 3 Well PPM stated that Payson agreed to purchase 200 units for $5.4 million, stating in pertinent part:

> Payson Petroleum, Inc. has agreed to purchase 200 Units of the Partnership equating to $5,400,000, as outlined in the PPM herein.
>
> *       *       *
>
> **Payson Position**
>
> Payson Petroleum, Inc. has agreed to purchase 20% of the Units (200 units) of the Partnership equating to $5,400,000.
>
> *       *       *
>
> Payson Petroleum, Inc. has agreed to purchase 200 Units of Partnership Interest, leaving 800 Units available for purchase to Participants.
>
> 3 Well PPM, at 2, 23, 33.

43.    The 3 Well PPM stated that "[i]n no event will Payson not purchase at least 10%, (100 Units) of partnership interest."

44.     The 3 Well PPM stated that Payson's $5.4 million contribution would fund 20% of the cost of the 3 Well Program, stating in pertinent part:

45.

The Program will be capitalized 80% from the sale of Units to Participants wishing to invest in the Partnership and 20% by Payson Petroleum, Inc. (the "Payson Position").

\*       \*       \*

## USE OF PROCEEDS

The proceeds of this offering ($27,000,000) are expected to be utilized in the manner set forth below:

| | | |
|---|---|---|
| **Gross Subscription Proceeds**: | $27,000,000 | 100% of Capitalization |
| **Subscription Proceeds of the 800 Units available to Participants**: | $21,600,000 | 80% of Capitalization |
| Commissions: | $1,512,000 | 7% |
| Due Diligence: | $324,000 | 1.5% |
| Managing Broker Dealer: | $324,000 | 1.5% |
| Drilling Proceeds: | $19,440,000 | 90% of the 80% |
| **Subtotal** | $21,600,000 | 80% |
| **Subscription Proceeds of the 200 Units available to Payson Petroleum:** | $5,400,000 | 20% of Capitalization |
| Marking and Program Costs: | $540,000 | 10% |
| Drilling Proceeds: | $4,860,000 | 90% of the 20% |
| **Subtotal:** | $5,400,000 | 20% |
| **Total Offering Proceeds:** | $27,000,000 | 100% |

3 Well PPM, at 1, 26-27.

46.     The 3 Well PPM stated that the "estimated" cost to drill and complete the wells was

approximately $24 million, stating in pertinent part:

> **In determining the offering price, consideration was given to the estimated cost of drilling and completing the three (3) wells. The projected costs for drilling each of the two vertical wells is $6,148,575, (See Exhibit "H" - AFE) for a combined total of $12,297,150 for drilling and completing the two vertical wells. The cost for the drilling and completing of the horizontal well is $11,702,472, (See Exhibit "H" – AFE).** The Partnership is raising $27,000,000 through this offering and proceeds from this offering are being used as set forth above (See "Use of Proceeds"). The proceeds from this offering account for 100% of the costs, fees, commissions and expenses of the offering.

3 Well PPM, at 27.

[Emphasis added].

**B.  3 Well 2014 PPM**

47.     The 3 Well 2014 PPM stated that Payson agreed to purchase 144.47 units for $3.9

million, stating in pertinent part:

> Payson Petroleum, Inc. has agreed to purchase 144.47 Units (equating to 20% of units offered in this offering) of the Partnership equating to $3,900,690, as outlined in the PPM herein.
>
> *        *        *
>
> **Payson Position**
>
> Payson Petroleum, Inc. has agreed to purchase 20% of the Units (144.47 units) of the Partnership equating to $3,900,690.
>
> *        *        *
>
> Payson Petroleum, Inc. has agreed to purchase 144.47 Units of Partnership Interest, leaving 577.88 Units available for purchase to Participants.

3 Well 2014 PPM, at 2, 24, 33.

48.     The 3 Well 2014 PPM stated that "[i]n no event will Payson not purchase at least

10%, (72.235 Units) of partnership interest."

49.     The 3 Well 2014 PPM stated that Payson's $3.9 million contribution would fund 20% of the cost of the 3 Well Program, stating in pertinent part:

> The Program will be capitalized 80% from the sale of Units to Participants wishing to invest in the Partnership and 20% by Payson Petroleum, Inc. (the "Payson Position").

\*     \*     \*

**USE OF PROCEEDS**

The proceeds of this offering ($19,503,450) are expected to be utilized in the manner set forth below:

| | | |
|---|---|---|
| **Gross Subscription Proceeds**: | $19,503,450 | 100% of Capitalization |
| **Subscription Proceeds of the 577.88 Units available to Participants:** | $15,602,760 | 80% of Capitalization |
| Commissions: | $1,092,193 .20 | 7% |
| Due Diligence: | $234,041.40 | 1.5% |
| Managing Broker Dealer: | $234,041.40 | 1.5% |
| Drilling Proceeds: | $14,042,484.00 | 90% of the 80% |
| **Subtotal:** | $15,602,760 | 80% |
| **Subscription Proceeds of the 144.47 Units available to Payson Petroleum:** | $3,900,960 | 20% of Capitalization |
| Marking and Program Costs: | $390,096 | 10% |
| Drilling Proceeds: | $3,510,864 | 90% of the 20% |
| **Subtotal:** | $3,900,960 | 20% |
| **Total Offering Proceeds:** | $19,503,450 | 100% |

Well 2014 PPM, at 1, 27.

50.    The 3 Well 2014 PPM stated that the "estimated" cost to drill and complete the wells was approximately $24 million, stating in pertinent part:

> **In determining the offering price, consideration was given to the estimated cost of drilling and completing the three (3) wells. The projected costs for drilling each of the two vertical wells is $6,148,575, (See Exhibit "H" - AFE) for a combined total of $12,297,150 for drilling and completing the two vertical wells. The cost for the drilling and completing of the horizontal well is $11,702,472, (See Exhibit "H" – AFE).** The Partnership is raising $19,503,450 through this offering and proceeds from this offering are being used as set forth above (See "Use of Proceeds"). The proceeds from this offering account for 100% of the costs, fees, commissions and expenses of the offering.

3 Well 2014 PPM, at 28.

### C.  Presentations

51.    The Sellers presented webinar slides, which were viewed by Plaintiffs and Class members, that referred to Payson's $5.4 million investment in the 3 Well Program as "skin in the game."

52.    The statements contained in ¶¶ 43 - 51 above were materially false and/or misleading because: (1) Payson never purchased a single unit and thereby contributed no money to the 3 Well Program; (2) consequently, Payson paid nothing towards its 20% share of the cost of the 3 Well Program; (3) Payson lacked the financial means to make the $5.4 million payment; (4) the true costs of drilling and completing the wells was $16-$18 million; (5) the "estimated" $24 million cost to drill and complete the wells was Payson's undisclosed fixed fee for drilling the wells, regardless of the actual drilling cost; and (6) Payson pocketed the difference between the $23 million raised in the two integrated offerings and the actual drilling cost—$16-$18 million.

53.    Accordingly, the Sellers sold units to Plaintiffs and Class members by means of untrue statements of material facts and/or omissions of material facts.

## THE TRUTH EMERGES

54.     On June 10, 2016, both Payson and Payson Operating filed for protection under Chapter 7 of the U.S. Bankruptcy Code. The proceeding was later converted to Chapter 11, to allow the bankruptcy trustee to conduct plugging and abandonment procedures on Payson's wells, as required by the State of Texas. The bankruptcy trustee projected that, after administrative expenses, neither company will have funds available to pay its unsecured creditors.

55.     On November 23, 2016, the SEC issued a Litigation Release announcing that it filed a civil action against M. Griffin and W. Griffin for fraudulently offering interests in the 3 Well Program, stating in pertinent part:

**U.S. SECURITIES AND EXCHANGE COMMISSION**

**Litigation Release No. 23694 / November 23, 2016**

*Securities and Exchange Commission v. Matthew Carl Griffin and William Daniel Griffin*, **Civil Action No. 4:16-cv-00902 (E.D. Tex. Sherman Division)**

**SEC Charges Matthew Carl Griffin and William Daniel Griffin with Fraud**

On November 23, 2016, the Securities and Exchange Commission filed a civil action charging brothers Matthew Carl Griffin and William Daniel Griffin with fraudulently offering interests in two Texas partnerships.

The SEC alleges that, between November 2013 and July 2014, the Griffins, through their company, Payson Petroleum, Inc., conducted a fraudulent two-phase offering of interests in two Texas partnerships, raising $23 million from approximately 150 investors for the purpose of developing three oil and gas wells. The SEC further alleges that the Griffins misled investors about Payson's promised participation in the program and about Payson's compensation as the program's sponsor and operator.

Specifically, the SEC alleges that the Griffins misrepresented to the investors: i) that Payson would contribute, up-front, 20% of the offering amount, or $5.4 million, and that this capital infusion would cover 20% of the cost of the wells; ii) that Payson's consideration as program sponsor/operator/co-investor would be limited to 20% of any petroleum revenue generated by the wells; and iii) that Payson would cover any cost overages, beyond the estimated $24 million, in drilling and completing the wells. The SEC further alleges that these were

misrepresentations because, in fact: i) Payson contributed no money to the offering and paid nothing toward the well costs; ii) Payson appropriated the entirety of the offering proceeds net of offering costs; and iii) Payson lacked the financial means to pay even the smallest cost overage.

In its complaint the Commission charges Matthew Carl Griffin and William Daniel Griffin with violating Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. Without admitting or denying the allegations in the SEC's complaint, Matthew Carl Griffin and William Daniel Griffin have each consented to a permanent obey-the-law injunction, disgorgement with prejudgment interest and a civil penalty in amounts to be determined by the Court upon motion by the Commission.

56. The SEC's civil action against M. Griffin and W. Griffin is styled as *Securities and Exchange Commission v. Griffin et al*, Docket No. 4:16-cv-00902 (E.D. Tex. Nov 23, 2016) (the "SEC Action"), and asserts violations of the federal securities laws, and alleges, among other things, that:

3. Payson lacked the means to make the $5.4 million payment and, in fact, contributed no money to the 3 Well Program. Consequently, Payson paid no portion of its 20% share of the well costs. Payson also lacked the means to pay any cost overages.

4. Moreover, Payson did not raise the $27 million it claimed was required. It raised only $23 million, all of it from investors.

5. Without informing the investors about any turn-key arrangement, and without specifying what consideration would flow to Payson for operating the 3 Well Program, the Griffins treated as Payson's fee the difference between its claimed, but undisclosed, $24 million turn-key entitlement and the wells' actual $16 - $18 million cost.

\*       \*       \*

23. Both PPMs contained material misrepresentations and misleading omissions. For example, Payson reiterates in each PPM that it will purchase, for a total $5.4 million, 200 of the 1,000 available units in the 3 Well Program. The PPMs spell out that this $5.4 million co-investment by Payson was 20% of the total $27 million Payson said it needed to fund fully the drilling and completion of the three wells ($24 million) and to cover the other costs of the two-phase offering ($3 million). The Griffins were the source of the PPMs' representations about Payson's co-investment. They believed that Payson's putting at investment risk $5.4 million of its own funds would attract investors to the 3 Well Program. In webinar slides prepared by the Griffins and viewed by

investors and the brokers selling the units, Payson's $5.4 million co-investment was referred to as "skin in the game."

24. According to the Griffins, Payson's promise to contribute 20% of the capital for the 3 Well Program was designed to distinguish Payson from other oil and gas promoters which typically receive, without putting up additional consideration (other than their services as operator), a carried interest in production revenue. In contrast, the Griffins represented to the investors that, in the 3 Well Program, Payson was putting its own money at risk of loss, and thereby aligning itself with the investors in looking to production revenue from the wells for a return of its $5.4 million principal, and, beyond that, a profit. In reality, Payson put up no money.

25. When they launched the 3 Well Program, and during the entire time Payson was offering and selling the investments, the Griffins knew that Payson's financial situation was desperate and that Payson did not have the financial wherewithal to perform the promises it was making, *i.e.*, the promise to co-invest $5.4 million, and to pay any cost overruns. The Griffins did not disclose to the investors Payson's financial plight; nor did the Griffins clarify that Payson lacked the cash reserves or access to capital to purchase the 200 units it claimed it would purchase. Likewise, the Griffins did not disclose that Payson lacked the financial resources to pay for any cost overruns in developing the wells.

26. Notably, as of September 30, 2013, the month before they began offering and selling the 3 Well Program, Payson had only $58,722 in its bank account. Payson's audited financial statements, which the Griffins had knowledge of as Payson's officers and directors, evidenced its dire condition. Its audited financials for 2011, 2012, and 2013, respectively showed year-end net losses of $352,742, $496,655, and $1,566,984. In fact, Payson's auditor noted that Payson's losses and deficits put Payson's ability to continue as a going concern in doubt.

27. The Griffins reviewed Payson's 2011 and 2012 audited financial statements and were aware of this financial information as they prepared the PPMs for the 3 Well Program. Specifically, the Griffins reviewed Payson's 2011 and 2012 audited financial statements.

28. Although Payson's 2013 audited financial statements were not finalized until June 26, 2014 – four days before the second phase of the offering closed – the Griffins reviewed an unaudited Payson balance sheet and statement of income, as of September 30, 2013. The balance sheet and statement showed, as of September 30, 2013, a net loss of $616,272, a cash position of only $58,722, and an accumulated deficit of $1,139,106.

29. The Griffins and Payson did not disclose any of this material financial information to prospective or actual investors.

30. Moreover, the Griffins did not disclose to the investors Payson's actual benefit from the 3 Well Program. The Griffins intended from the outset that Payson would retain $24 million (net of the actual well costs) of the presumed $27 million raised in the offering as its putative "drilling fee." This was never disclosed to the investors. More particularly, the Griffins knew that Payson had executed contracts with PP3 and PP3-2014--the two limited partnership issuers they formed--to drill the 3 Well Program for a fixed price of $24 million. In each PPM, this $24 million is mischaracterized as the "estimated" cost of the three wells. In fact, the sum was a fixed contractual fee, not a mere "estimate," a term which misleadingly implies variability and that any cost savings, *i.e.*, drilling and completing the wells for less than $24 million, would inure to the investors' benefit. It actually cost between $16 and $18 million to drill and complete the three wells, not $24 million. Neither the limited partnership issuers, nor the investors themselves, received back any portion of the difference between the $24 million "estimate" and the wells' actual cost.

57.     On November 23, 2016, the Consent of Defendant Matthew Carl Griffin and the Consent of Defendant William Daniel Griffin ("M. Griffin and W. Griffin's Consents") were entered in the SEC Action, wherein, among other things, M. Griffin and W. Griffin agreed to accept a civil penalty and "not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the Complaint or creating the impression that the Complaint is without factual basis."

58.     On December 30, 2016, U.S. District Judge Amos L. Mazzant of the U.S. District Court for the Eastern District of Texas entered Interlocutory Judgments As to M. Griffin and W. Griffin, incorporating M. Griffin's and W. Griffin's Consents into Judgments and Orders of the Court.

59.     As a result of the Sellers wrongful acts and omissions, Plaintiffs and Class members have suffered significant losses and damages.

## THE SELLERS ACTIVELY SOLICITED PLAINTIFFS' AND CLASS MEMBERS' PURCHASES OF UNITS

60.     The 3 Well PPM offered 1,000 units in 3 Well at a cost of $27,000 per unit for a total offering amount of $27,000,000. Only 277.65 units were sold in the 3 Well offering that closed on December 31, 2013, for total gross proceeds of $7,496,550.

61.     The 3 Well 2014 PPM offered the remaining 722.35 units as part of the 3 Well 2014 offering, at a cost of $27,000 per unit for a total offering amount of $19,503,450. In total, the two offerings in the 3 Well Program raised $23 million.

62.     The Sellers offered the units to Plaintiffs and Class members on a "best efforts" basis.

63.     The 3 Well PPM and the 3 Well 2014 PPM stated that the "offering and placement fees and/or commissions, [] could total an amount up to 10% of the total offering amount."

64.     Additionally, the 3 Well PPM and the 3 Well 2014 PPM set forth the plan of distribution for the offering and the terms at which the Broker-Dealer Defendants would receive fees and sales commissions for each unit sold by them:

**Each Selling Agent will receive a commission equal to 7% and a non-accountable due diligence fee of 1.5% on all Units sold by that Selling Agent. In addition, the Managing Broker Dealer will receive a 1.5% commission on the sale of all units sold through the Selling Agents.**

*        *        *

**PLAN OF DISTRIBUTION**

**Commissions**

**The units will be offered on a "best efforts" basis by PTX Securities, LLC, which will serve as the Managing Broker Dealer ("dealer manager") in Texas, and by other selected registered broker/dealers (BD's), which are members of the FINRA and/or Registered Investment Advisors (RIA) acting as selling agents.** Best efforts means that the dealer-manager and selling agents will not guarantee the sale of a certain amount of units. **Also, the units may be offered and sold by the officers and directors of the Managing General Partner**…

**To the extent allowed by law, the dealer-manager or the selling agents will manage and oversee the offering of the units as described above and will receive on each unit sold:**

- a 1.5% dealer-manager fee
- a 7% sales commission;
- a 1.5% due diligence fee;

If the dealer-manager is unable to receive this compensation because it is not registered in a state or is not exempt from registration, then the Managing General Partner further reserves the right to pay the compensation directly to registered broker/dealers, which are members of the FINRA, acting as selling agents.

The Managing General Partner, or an affiliate, may use the services of one or more wholesalers. **The dealer-manager may make direct sales as a selling agent and receive all the fees and commissions set forth above.**

\*       \*       \*

After the minimum subscriptions are received by the partnership and the checks have cleared the banking system, **the dealer-manager fee, the sales commissions, the due diligence fee and any other fees will be paid to the Managing Broker Dealer and BD's approximately once monthly until the offering of the partnership closes.** RIA's selling partnership units will not be paid sales commission unless they are also registered as BD's.

The managing general partner may, in its discretion, establish alternative or modified commission arrangements with broker/dealers and investment advisors, including, without limitation, the payment of an annual management fee in lieu of commissions. **All commission and fees related to the distribution of the units is being paid by the managing general partner as part of its contribution to the partnership**. The managing general partner does not contemplate paying any alternate fees or compensation aggregating more than 10% of the sale price of the units.

3 Well PPM and 3 Well 2014 PPM, at 1, 32.

[Emphasis added].

65.    On November 8, 2013, 3 Well filed a Form D – Notice of Exempt Offering of Securities with the SEC, which was signed by M. Griffin, stating that the estimate for the amount of sales commissions for the 3 Well offering was $2.7 million (the "3 Well Form D"). Additionally, the 3 Well Form D stated that investors were solicited from all U.S. States to purchase units in 3 Well.

66.     On January 27, 2014, 3 Well 2014 filed a Form D – Notice of Exempt Offering of Securities with the SEC, which was signed by M. Griffin, stating that the estimate for the amount of sales commissions for the 3 Well 2014 offering was $1,560,276 (the "3 Well 2014 Form D"). Additionally, the 3 Well 2014 Form D stated that investors were solicited from Texas, and that EDI Financial solicited investors from 50 U.S. States to purchase units in 3 Well 2014. Moreover, the 3 Well 2014 Form D stated that EDI Financial and Prinz were the recipients of sales compensation.

67.     By actively soliciting investors to purchase units in the 3 Well Program, the Broker-Dealer Defendants made millions in sales commissions from selling units to Plaintiffs and Class members.

68.     The Sellers conducted a nationwide marketing campaign promoting the 3 Well Program in order to solicit Plaintiffs' and Class members' purchases of units.

69.     The Sellers invited Class members to dinners in Texas to market and promote the 3 Well Program. The dinners were attended by Payson representatives, the Broker-Dealer Defendants' representatives, as well as many Class members.

70.     The Sellers also solicited Class members by e-mailing and mailing them offering materials for the 3 Well Program, including the 3 Well PPM and the 3 Well 2014 PPM. Additionally, the Sellers made unsolicited telephone calls to Class members for the purpose of soliciting Class members' purchases of units in the 3 Well Program.

71.     The Broker-Dealer Defendants' representatives marketed and promoted the 3 Well Program by holding in person sales presentations and meetings with Class members, where offering materials, including the 3 Well PPM and the 3 Well 2014 PPM, were provided to Class members.

72.     Additionally, throughout the offering of the 3 Well Program,  Nichter gave Class members tours of the three oil and gas wells in Grayson County, Texas to solicit Class members' purchases of units in the 3 Well Program.

### DEFENDANT EDI FINANCIAL'S SALE TO PLAINTIFF JEFF WILSHIRE

1.      Plaintiff Wilshire first learned of the 3 Well Program in November of 2013, when Mark Modlin, a neighbor, asked him to attend a dinner at a steak house in Forth Worth, TX where Payson would be providing an overview of the 3 Well program and the 3 Well offering. Matt Griffin spoke, as did Joel Woods from EDI Financial. Mr. Woods reiterated the materially false and misleading statements in the 3 Well PPM as alleged herein. Mr. Woods requested that Plaintiff Wilshire fill out some limited paperwork, on the basis of which Mr. Wodds "qualified" Plaintiff Wilshire for the offering.

2.      On or about November 25, 2013, Plaintiff Wilshire signed a Subscription Agreement by which he purchased 1.17 units in 3 Well LP for $30,000 from EDI Financial through its selling representative, Joel Woods.

3.      On or around February 2014, Mr. Woods called Plaintiff Wilshire and requested that he attend a dinner held at the Forth Worth Country Club in Forth Worth, Texas, where Matt griffin provided an "update" on the status of the 3 Well LP program and a sales pitch on why Plaintiff Wilshire and the others in attendance "should consider getting in on" the 3 Well 2014 LP offering. Joel Woods of EDI Financial was also in attendance. Again, Mr. Woods reiterated the materially false and misleading statements contained in the offering documents—this time the 3 Well 2014 PPM. Mr. Woods subsequently contacted Mr. Wilshire and encouraged him to expand his investment in the 3 Well Program.

4.      On or about March 26, 2014, Plaintiff Wilshire signed a Subscription Agreement by which he purchased 0.74 units in 3 Well 2014 LP for $20,000 from EDI Financial through its selling representative, Joel Woods.

### DEFENDANT FINANCIAL WEST'S SALE TO PLAINTIFF WANG

5.      Wang first learned of the 3 Well Program during the week of June 16, 2014, when Greg Klein, a selling representative for Financial West, called Wang to introduce the 3 Well Program. Wang answered Greg Klein's call, wherein Mr. Klein gave Wang a summary of the 3 Well Program. During the call, Wang and Mr. Klein both agreed to schedule a further call on Friday, June 20, 2014 at Wang's office in Burbank, CA, to go over the details of the 3 Well Program. During that call on June 20, 2014, Mr. Klein reiterated the materially false and misleading statements in the 3 Well 2014 PPM as alleged herein, and assured Wang that this was "not a high risk investment" and that it had "a high upside." Mr. Klein intimated that the 3 Well Program was something he was "high on" and that he had elder family members who invested in the partnerships. During Wang's conversations with Mr. Klein, Mr. Klein stated that the managing partner and operator of the 3 Well Program, Payson Grayson and Payson respectively, have deep experience in these types of investments, and thus, were reliable partners who can maximize returns on investments for investors.

6.      On or around June 23-24, 2014, Mr. Klein mailed the 3 Well 2014 PPM to Wang. On June 27, 2014, Wang purchased his units in 3 Well 2014 for $30,000 from Financial West through its selling representative, Greg Klein.

### DEFENDANT EDI FINANCIAL'S SALES TO PLAINTIFF MARTIN

7.      Martin learned about the 3 Well Program from Mark Modlin, who was an investor in a prior Payson securities offering. Mr. Modlin informed Martin of a dinner selling presentation

for the 3 Well Program at Ruth's Chris Steakhouse in Fort Worth, TX on Tuesday, November 5, 2013. Mr. Modlin was a client of Joel F. Woods, a selling representative for EDI Financial, and asked Mr. Woods to place Martin on the invite list for the dinner. Martin attended the dinner presentation where Nichter, M. Griffin, and Joel F. Woods touted the 3 Well Program. At the dinner, a selling presentation was shown to Martin and other Class members, and Nichter and Joel F. Woods distributed offering materials, including the 3 Well PPM, to Martin and other Class members. Some Class members purchased their units at the dinner presentation. Nine days after the dinner presentation, on November 14, 2013, Martin purchased his units in 3 Well for $40,000 from EDI Financial through its selling representative, Joel F. Woods.

8.     On January 15, 2014, Nichter sent an email to Martin and other Class members regarding the commencement of the offering of 3 Well 2014. This email prompted Martin to contact Nichter on April 4, 2014, to inquire whether he could make additional investments in the 3 Well Program. Nichter answered "Yes" and referred Martin to his broker Joel Woods of EDI Financial. Shortly thereafter, Joel Woods sent Martin the 3 Well 2014 PPM. On April 21, 2014, Martin purchased his units in 3 Well 2014 for $19,000 from EDI Financial through its selling representative, Joel Woods. After discussing a third potential investment in the 3 Well Program with Joel Woods, on June 16, 2014, Martin purchased additional units in 3 Well 2014 for $40,000 from EDI Financial through its selling representative, Joel Woods.

**DEFENDANT MIDAMERICA'S SALE TO PLAINTIFFS TAPAN & ANISA DAFTARI**

9.     Dr. Tapan and Mrs. Anisa Daftari (hereinafter, the "Daftaris") initially heard about the 3 Well Program through a family friend in Florida, who put them in touch with Anthony Cottone, who was then working as a financial advisor and was a licensed broker and representative

of MidAmerica Financial, Inc.[2] In February of 2014, Mr. Cottone began an extensive e-mail and telephone correspondence with the Daftaris. Mr. Cottone gave the Daftaris a summary of the 3 Well Program, in which he reiterated the false and misleading statements contained in the 3 Well PPM, and encouraged the Daftaris to bring friends in or the investment. Mr. Cottone e-mailed the Daftaris a copy of the 3 Well 2014 Subscription Agreement on February 23, 2014, and the 3 Well 2014 PPM on June 13, 2014.

10.     Mr. Cottone made a series of false and misleading statements to convince the Daftaris to invest in the 3 Well Program. In an e-mail dated June 23, 2014, Mr. Cottone told the Daftaris, "… I think you will find this to be one of your greatest investments." In an e-mail dated June 25, 2014, he called the 3 Well Program a "great deal" and encouraged the Daftaris to put him in touch with "anyone else that might want to participate."

11.     In or about June 25, 2014, the Daftaris purchased their units in 3 Well 2014 for $108,000 from Defendants MidAmerica through its broker, Anthony Cottone.

**DEFENDANT EDI FINANCIAL'S SALES TO PLAINTIFF MARTIN**

12.     Martin learned about the 3 Well Program from Mark Modlin, who was an investor in a prior Payson securities offering. Mr. Modlin informed Martin of a dinner selling presentation for the 3 Well Program at Ruth's Chris Steakhouse in Fort Worth, TX on Tuesday, November 5, 2013. Mr. Modlin was a client of Joel F. Woods, a selling representative for EDI Financial, and asked Mr. Woods to place Martin on the invite list for the dinner. Martin attended the dinner presentation where Nichter, M. Griffin, and Joel F. Woods touted the 3 Well Program. At the dinner, a selling presentation was shown to Martin and other Class members, and Nichter and Joel

---

[2] On information and belief, Mr. Cottone ceased his affiliation with Defendant Midamerica and began working with Defendant Financial West in or around August of 2014.

F. Woods distributed offering materials, including the 3 Well PPM, to Martin and other Class members. Some Class members purchased their units at the dinner presentation. Nine days after the dinner presentation, on November 14, 2013, Martin purchased his units in 3 Well for $40,000 from EDI Financial through its selling representative, Joel F. Woods.

13. On January 15, 2014, Nichter sent an email to Martin and other Class members regarding the commencement of the offering of 3 Well 2014. This email prompted Martin to contact Nichter on April 4, 2014, to inquire whether he could make additional investments in the 3 Well Program. Nichter answered "Yes" and referred Martin to his broker Joel Woods of EDI Financial. Shortly thereafter, Joel Woods sent Martin the 3 Well 2014 PPM. On April 21, 2014, Martin purchased his units in 3 Well 2014 for $19,000 from EDI Financial through its selling representative, Joel Woods. After discussing a third potential investment in the 3 Well Program with Joel Woods, on June 16, 2014, Martin purchased additional units in 3 Well 2014 for $40,000 from EDI Financial through its selling representative, Joel Woods.

### DEFENDANT NICHTER'S SALES TO PLAINTIFF MOORE

14. Moore met Nichter on or around December 23, 2013, when Nichter introduced the 3 Well Program to Moore. On that date, Nichter emailed Moore offering materials for the 3 Well Program and stated via email that he would send Moore the 3 Well PPM. A few days later, Moore received the 3 Well PPM by mail at his home in Rockwall, Texas. On December 27, 2013, Moore sent Payson his subscription agreement for 3 Well with a check for $27,000 to purchase 1 unit in 3 Well. On December 30, 2013, Nichter emailed Moore confirming receipt of his subscription agreement and check for 3 Well.

15. On or about January 16, 2014, Nichter introduced the 3 Well 2014 offering to Moore by phone. On January 16, 2014, Nichter emailed Moore the 3 Well 2014 PPM. On or about

January 23, 2014, Moore sent Payson his subscription agreement for 3 Well 2014 with a check for $27,000 to purchase 1 unit in 3 Well 2014. On February 1, 2014, Nichter emailed Moore confirming receipt of his subscription agreement and check for 3 Well 2014.

16.     On February 22, 2014, Moore attended a "rig-up" event hosted by Payson, where Payson and its representatives conducted a BBQ event and gave Class members tours of the wells in Grayson County, Texas. At the event, Moore met Nichter and other Class members.

17.     In early April 2014, Nichter sent Moore the 3 Well 2014 PPM. On April 15, 2014, Moore sent Payson an additional purchase agreement and a check for $87,750 to purchase 3.25 units in 3 Well 2014.

18.     Nichter was Moore's point of contact at Payson regarding the 3 Well Program. They communicated by phone and email on multiple occasions throughout the offering of the 3 Well Program.

<u>**THE 3 WELL PROGRAM'S UNITS ARE SECURITIES**</u>

19.     Tex. Rev. Civ. Stat. Ann. art. 581-4(A) defines "security" or "securities" as "**any limited partner interest in a limited partnership**…certificate or any instrument representing any interest in or under an oil, gas or mining lease, fee or title, or any certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, investment contract, or any other instrument commonly known as a security, whether similar to those herein referred to or not…The term applies regardless of whether the 'security' or 'securities' are evidenced by a written instrument." (emphasis added).

20.     The units represented limited and/or general partnership interests in the 3 Well Program and are thereby securities as defined by Tex. Rev. Civ. Stat. Ann. art. 581-4(A).

21.     The purpose of the 3 Well Program was to fund the drilling, completion, and operation of the two vertical wells and one horizontal well in Grayson County, Texas.

22.     The Sellers offered investors a choice of purchasing units in the 3 Well Program as either limited partnership interests or general partnership interests. The decision to offer this choice was driven exclusively by tax considerations. Indeed, the 3 Well PPM and 3 Well 2014 PPM expressly stated that all general partnership units would convert to limited partnership units upon the completion of the three wells (that conversion occurred on September 11, 2015, once the wells were completed.) Despite the sale to many Class members of general partnership interests, neither Payson Grayson, as Managing General Partner of the 3 Well Program, nor Plaintiffs and Class members, ever intended for investors to function as general partners, *i.e.*, with management responsibility. Rather, Payson Grayson, Plaintiffs, and Class members all understood that investors would remain passive players in the 3 Well Program, with no role in its management or operation. Indeed, both the 3 Well PPM and 3 Well 2014 PPM expressly stated that Payson Grayson would "exercise full control" over 3 Well and 3 Well 2014's operations.

23.     Plaintiffs and Class members are numerous, geographically dispersed, lack expertise in oil and gas operations, and had no prior relationship with each other and no means of identifying or contacting one another to communicate about their investments. Plaintiffs and Class members were thus wholly dependent on the efforts of M. Griffin and Payson Grayson, as well as Payson and Payson Operating, to generate profits. Consequently, even though the general partnership interests were purchased by many Class members, none of the parties expected investors to play a general partnership role in the 3 Well Program, and in fact, they did not play such role at any time.

**CLASS ACTION ALLEGATIONS**

24.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all persons and entities, other than Defendants, who purchased or otherwise acquired units in the 3 Well Program by means of two sets of fraudulent offering documents:

(1) the 3 Well PPM and other offering documents for an offering that commenced on October 23, 2013 and closed on December 31, 2013; and/or

(2) the 3 Well 2014 PPM and other offering documents for an offering that commenced on January 12, 2014 and closed on June 30, 2014, (the "Class").

Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

25.     The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiffs at this time but it is believed to be in the hundreds. Members of the Class may be identified by records maintained by Defendants and their transfer agents, and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

26.     Plaintiffs' claims are typical of the claims of the Class members because all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the Texas securities laws asserted herein.

27.     Plaintiffs have and will continue to fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Texas securities laws were violated by the Defendants' respective acts as alleged herein;

(b)     whether the offering documents, including the 3 Well PPM and the 3 Well 2014 PPM, distributed by the Sellers to the investing public omitted and/or misrepresented material facts about the 3 Well Program and its business, operations, and prospects; and

(c)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## COUNT I

### For Violation of Article 581-33(A)(2) of the Texas Securities Act
### Against The Sellers

30.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

31.     The Sellers violated Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2), by offering, soliciting, and/or selling units in the 3 Well Program to Plaintiffs and Class members by means of untrue statements of material facts and/or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

32.     This claim was brought within three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence, and within five years after the sale of the units to Plaintiffs.

## COUNT II

### For Violations of Article 581-33F(1) of the Texas Securities Act
### Against the Control Person Defendants

33.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

34.     The Control Person Defendants violated Tex. Rev. Civ. Stat. Ann. art. 581-33F(1), because as senior officers, directors, and/or significant shareholders of the Broker-Dealer Defendants, directly or indirectly control the Broker-Dealer Defendants, and are therefore jointly and severally liable with the Broker-Dealer Defendants, and to the same extent as the Broker-Dealer Defendants, for their violations of Tex. Rev. Civ. Stat. Ann. art. 581-33A(2).

35.     This claim was brought within three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence, and within five years after the sale of the units to Plaintiffs.

## DAMAGES AND RECISSION

36.     Pursuant to Tex. Rev. Civ. Stat. Ann. art. 581-33D, Plaintiffs' and Class members' seek rescission of all the Sellers' sales of the units and/or damages for Plaintiffs' and Class members' purchases of units.

## EXEMPLARY DAMAGES

37.     The wrongful conduct set forth herein constitutes fraud, malice, or gross negligence within the meaning of Tex. Civ. Prac. & Rem. Code Ann. § 41.003. Plaintiffs and Class members

are entitled to recover exemplary damages in an amount necessary to punish the Defendants and to deter similar conduct of others in the future.

## ATTORNEYS' FEES AND COSTS

38.     Plaintiffs' seek their reasonable attorneys' fees and costs pursuant to Tex. Rev. Civ. Stat. Ann. art. 581-33D(6)-(7).

## DEMAND FOR TRIAL BY JURY

39.     Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

40.     WHEREFORE, Plaintiffs' demand judgment against the Defendants as follows:

a.   Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23;

b.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

c.   Requiring Defendants to rescind the sales of all the units to Plaintiffs and Class members;

d.   Awarding Plaintiffs and Class members pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

e.   Awarding such other and further relief as this Court may deem just and proper.

Dated: May 25, 2018                    Respectfully submitted,

                                       **THE ROSEN LAW FIRM, P.A.**

                                       */s/ Brent J. LaPointe*
                                       Laurence Rosen, Esq.
                                       Phillip Kim, Esq.
                                       Brent J. LaPointe, Esq.
                                       275 Madison Avenue, 34th Floor
                                       New York, NY 10116
                                       Phone: (212) 686-1060
                                       Fax: (212) 202-3827
                                       Email: lrosen@rosenlegal.com
                                       Email: pkim@rosenlegal.com
                                       Email: blapointe@rosenlegal.com

                                       *-And-*

                                       **STECKLER GRESHAM COCHRAN PLLC**
                                       R. Dean Gresham
                                       Texas Bar No. 24027215
                                       Bruce Steckler
                                       Texas Bar No. 00785039
                                       L. Kirstine Rogers
                                       Texas Bar No. 24033009
                                       12720 Hillcrest Rd, Suite 1045
                                       Dallas, Texas 75230
                                       Telephone: (972) 387-4040
                                       Facsimile: (972) 387-4041
                                       Email: dean@stecklerlaw.com
                                       Email: bruce@stecklerlaw.com
                                       Email: krogers@stecklerlaw.com

                                       *Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th of May, 2018, a true and correct copy of the foregoing document was filed in the Northern District of Texas using its CM/ECF system which will send notice of the filing to the parties registered to the Court's CM/ECF system.

*/s/ Brent J. LaPointe*
Brent J. LaPointe